**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-01929-SKC-TPO

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**CITY AND COUNTY OF DENVER, COLORADO,** and
**DENVER POLICE DEPARTMENT,**

Defendants.

---

**BRIEF OF THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF JEFFERSON AND THE CITY OF AURORA, COLORADO AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

---

## INTRODUCTION

This is a case about federalism. The U.S. Department of Justice (the "Department") seeks declaratory and permanent injunctive relief enjoining the City and County of Denver (the "City") from enforcing an ordinance prohibiting assault weapons and large-capacity magazines (the "Ordinance"), duly enacted under police power granted to the City under a home rule charter adopted pursuant to Article XX of the Colorado Constitution. Under our constitutional structure, the Ordinance is squarely within the police powers reserved to the States, or to the people, under the Tenth Amendment of the U.S. Constitution. Local and municipal authorities are empowered to regulate within that police power, unless federal law unambiguously displaces that authority, U.S. CONST., ART. VI, Cl. 2. When interpreting Congressional enactments, absent a clear statement to the contrary, the

constitutional balance between federal and state and local governments must be maintained. *See* ECF No. 33 at 26-28.

The Department invokes 34 U.S.C. § 12601 ("Section 12601"), a provision of the Violent Crime Control and Law Enforcement Act of 1994, a statute that, by its express terms, prohibits any unconstitutional "pattern or practice of conduct by law enforcement officers." Bypassing traditional standing, ripeness, case-or-controversy, and other prudential considerations, the Department alleges that the City's enforcement of the Ordinance represents "a pattern or practice of conduct by law enforcement officers" that violates the provisions of Section 12601. ECF No. 31¶ 51.

To describe the Department's invocation of Section 12601 in this manner as novel understates the full extent of the Department's overreach in this case. The operative complaint does not plead any plausible "pattern or practice of conduct by law enforcement officers" that is within Section 12601's ambit. Rather, the Department endeavors to use this provision to mount a facial challenge to a municipal ordinance based solely on alleged unconstitutionality of the ordinance. In its effort to achieve that objective, the Department urges an interpretation of Section 12601 that is unprecedented, contrary to its plain language, and completely at odds with its historical purpose.

Allowing declaratory and injunctive relief under these circumstances would pave the way for the Department to mount similar challenges to myriad state, local, and municipal statutes and ordinances that regulate public safety, health, order, and welfare, without pleading the "pattern or practice of conduct" in violation of civil rights that is required under the law. State and local authorities enact such laws and ordinances under the police power that is constitutionally, traditionally, and uniquely within the domain reserved to them. Under their reading of the law, so long as the

Department asserts a putative nexus between such police-power ordinances and some purported burden upon a constitutional right, the Department could enjoin enforcement of the ordinances under Section 12601 without demonstrating any systemic police misconduct or any pattern or practice of conduct by law enforcement officers that violates federal law.

Under our constitutional structure, the States and the people retain all powers not expressly delegated to the Federal Government. U.S. CONST., AMEND. X. Public safety, health, order, and welfare are traditional police-power domains reserved to state and local authorities. Firearm violence prevention is paradigmatically a local public-safety concern, and one state, local, and municipal authorities routinely regulate. It is not an area of exclusive federal control, nor is it contrary to federal law. On the contrary, the Ordinance is an assault weapons ban that is similar in many respects to the federal assault weapons ban that Congress passed many years ago, in the selfsame Violent Crime Control and Law Enforcement Act of 1994 that enacted the "pattern or practice" statute found in Section 12601. The Ordinance also restricts possession of magazines with a capacity exceeding fifteen (15) rounds, a type of restriction that numerous state and local jurisdictions, including the State of Colorado, have enacted.

State and local governments are entitled to a presumption of the regular exercise of police power when they enact public safety, health, order, and welfare ordinances. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (recognizing "the historic primacy of state regulation of matters of health and safety" and applying a presumption against federal displacement of traditional police powers). That presumption is especially strong where the local government body can show that the state constitution, home-rule statute, charter, or enabling act affirmatively delegates

local authority over public safety, dangerous weapons, nuisance conditions, zoning, or emergency protection. Indeed, it is incumbent upon the federal courts to be certain of Congress' intent before they construe federal legislation to alter the "usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). "[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Id.* at 460-61 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). Indeed, Congress must "make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States." *Id.* at 461 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The Court should not countenance the Department's attempt to invoke Section 12601 as a vehicle to mount facial constitutional challenges to municipal ordinances. It should instead grant the City's Motion to Dismiss. ECF No. 33.

**1. Public safety, health, order, and welfare are traditional police-power domains reserved to state and local authorities under the Constitution.**

The Constitution established a system of "dual sovereignty" between the States and the Federal Government. *Ashcroft*, 501 U.S. at 457. At the founding, the States surrendered many of their powers to the new Federal Government but retained what James Madison described as "a residual and inviolable sovereignty." FEDERALIST NO. 39, at 245 (James Madison) (C. Rossiter ed. 1961). The Constitution gives the Federal Government enumerated powers. *See* U.S. CONST., ART. I, § 8. As Madison wrote, "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which remain in the State governments are numerous and indefinite." FEDERALIST NO. 45, at 292-93 (James Madison) (C. Rossiter ed. 1961). The Framers adopted this constitutionally mandated division of authority "to ensure protection of

our fundamental liberties." *Ashcroft*, 501 U.S. at 458 (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.*

It is axiomatic that "under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). Residual state sovereignty is implicit in the Constitution's conferral upon Congress of only discrete, enumerated powers, not all governmental powers. U.S. CONST. ART. I, § 8. The Tenth Amendment makes explicit that implied reservation of powers, declaring "[t]he powers not delegated to the United States by the Constitution, nor prohibited to the States, are reserved to the States respectively, or to the people." U.S. CONST., AMEND. X. The States thus retain substantial sovereign authority under our constitutional system.

This design was intended to ensure "our citizens would have two political capacities, one state and one federal, each protected from incursion by the other. . . . a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring). The Constitution thus contemplates that a state government will represent and remain accountable to its own citizens. *See New York v. United States*, 505 U.S. 144, 168-69 (1992). As Madison expressed it, "the local or municipal authorities form distinct and independent portions of the supremacy, no more subject,

within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere." FEDERALIST NO. 39 at 245.

The federalist structure of joint sovereigns assures a decentralized government "that will be more sensitive to the diverse needs of a heterogenous [sic] society: it increases [the] opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry." *Ashcroft*, 501 U.S. at 458 (citing Michael W. McConnell, *Federalism: Evaluating the Founders' Design Federalism: The Founders' Design. Raoul Berger. Univ. of Okla. Press,* 1987 Pp. 223., 54 U. CHI. L. REV. 1484, 1491-1511 (1987); Deborah Jones Merritt, *The Guarantee Clause and State Autonomy: Federalism for a Third Century*, 88 COLUM. L. REV. 1, 3-10 (1988)). The Supreme Court's consistent understanding has been that "[t]he States unquestionably do retai[n] a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *New York*, 505 U.S. at 156 (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985), internal quotation marks omitted).

The States "have broad authority to enact legislation for the public good," under what the Supreme Court has often called a "police power." *Bond v. United States*, 572 U.S. 844, 854 (2014) (citing *United States v. Lopez*, 514 U.S. 549, 567 (1995)). As the Court explained:

> The States thus can and do perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few—even though the Constitution's text does not authorize any government to do so. Our cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the "police power." … Because

> the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed.

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535-36 (2012) (citing U.S. CONST. ART. I, § 8). As a result, the Constitution "requires a distinction between what is truly national and what is truly local." *United States v. Morrison*, 529 U.S. 598, 617-18 (2000) (citing *Lopez*, 514 U.S. at 568). The Court has recognized that "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Id.* at 618 (citing *Cohens v. Virginia*, 19 U.S. 264, 426, 428 (1821)). Indeed, the Court has opined that there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Id.* (citing *Lopez*, 514 U.S. at 566).

**2. Enforcement of duly enacted local and municipal ordinances relating to public health and safety is not a "pattern or practice of conduct" subject to the remedies available under Section 12601.**

This case involves the fundamental power and authority of state and local governments to enact and generally enforce public health, safety and related measures that are uniquely within the police powers reserved to them under our constitutional structure. The enactment and general enforcement of such statutes, regulations and ordinances has always been within the lawful authority of state and local governments, even where the regulation arguably places a burden on the exercise of constitutional rights. Ordinances regulating zoning; land use; dangerous instrumentalities; parades and protests; camping and encampment; noise and noise abatement; environmental hazards and waste disposal; and drilling and fracking are

but a few examples of state and local regulation that may constrain, restrict, or dictate the time and manner of the exercise of constitutional rights and privileges.[1] But the mere enactment or general enforcement of such ordinances does not, by itself, rise to the level of a "pattern or practice of conduct" that runs afoul of Section 12601's prohibitions.

Firearm violence prevention and firearms regulation are matters of public safety traditionally associated with the police powers of state and local governments. Public safety—including the regulation of firearms—falls squarely within this traditional police-power domain. Police powers are the fundamental ability of state and local governments to enact laws for the public good, encompassing broad regulatory authority over public welfare, health, safety, and morals. The Tenth Amendment safeguards this ability against Federal Government overreach, ensuring that the Federal Government will not encroach upon powers reserved to the states except to the extent of its ability to legislate within its enumerated powers.

Federal firearms statutes regulate particular interstate, commercial, and criminal interests but do not occupy the field exclusively. The Federal Gun Control

[1] For example, Colorado law authorizes local regulation across politically diverse public safety and welfare subjects, including municipal fire control regulations, Colo. Rev. Stat. § 31-15-601(1)(j) (authorizing municipalities to regulate or prevent the storage or and transportation of combustible or explosive materials, including fireworks); local land use regulation, Colo. Rev. Stat. § 29-20-104(b)-(f) (authorizing local governments to protect wildlife habitat and preserve historical and archeological areas); local air pollution ordinances, Colo. Rev. Stat. § 25-7-128(1) (authorizing cities and counties to enact local air pollution resolutions or ordinances containing emission control regulations that are at least as stringent as state emission control regulations); and stricter local regulation of energy and carbon management operations, Colo. Rev. Stat. § 34-60-131 (providing that local governments and state agencies have regulatory authority over energy and carbon management operations, and that a local government's regulations may be more protective or stricter than state requirements).

Act itself presupposes that firearms regulation is a shared, concurrent field rather than an exclusively federal one. Section 922 of Title 18 repeatedly conditions lawful firearms activity on compliance with "Federal, State, and local law." *See* 18 U.S.C. § 922. Similarly, 42 U.S.C. § 5207, which governs firearms policies during federal disaster relief, prohibits federal officials from confiscating or restricting firearms where possession or carrying is "otherwise authorized . . . under Federal, State, or local law." Far from preempting the field, this statutory architecture expressly preserves a role for state and local regulation. The question presented by amici's federalism argument is not whether any particular ordinance satisfies the Second Amendment, but whether Section 12601 clearly preempts state and local authority by treating ordinary enactment and general enforcement of such ordinances as systemic law enforcement misconduct. It does not.

The plaintiff here—the United States Government, acting through the Civil Rights Division of the Department of Justice—is attempting to use Section 12601 to mount a facial challenge to the Ordinance. The Court should reject this naked attempt to mount a constitutional challenge to the Ordinance by invoking the mechanism provided in Section 12601 to remedy a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, or immunities secured or protected by the Constitution. Not only has the Department failed to plausibly allege a "pattern or practice of conduct" within the scope of Section 12601, ECF No. 33 at 29-30, but a reading of that Section that would allow the Department to enjoin the enforcement of such ordinances without the requisite showing of a "pattern or practice of conduct" would hamstring local authorities' ability to regulate under the police power.

The Department's Section 12601 claim relies solely on the alleged unconstitutionality of the Ordinance. It wholly fails to identify an unlawful pattern or practice of any Colorado law enforcement agency.[2] This interpretation of Section 12601 is a radical departure from the historical application of the law. Section 12601 was enacted as part of the Violent Crime Control and Law Enforcement Act of 1994 in response to Los Angeles police officers' beating of Rodney King. *See United States v. California*, No. 8:26-cv-01697-MRA-ADSX, 2026 WL 2004372, at *4 (C.D. Cal. July 9, 2026) (citing Ex. 1 to ECF No. 33, Civ. Rts. Div., U.S. Dep't of Just., *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* (2017), at 3). The Department has historically used Section 12601 to enforce "the rights to be free from excessive force; unreasonable stops and searches; arrests without warrants or sufficient cause, or in retaliation for exercising free speech rights; and discrimination based on factors such as race, ethnicity, national origin, religion, disability, and sex—including sexual orientation, gender identity, and LGBT status." Ex. 1 to ECF No. 33 at 2.

Here, the challenged Ordinance is not a law enforcement policy or practice, but rather a law passed by the City proscribing ownership of certain types of firearms and firearm accessories. The only conduct at issue is enactment or general enforcement of the Ordinance itself, not any pattern or practice of enforcement of the Ordinance in an unconstitutional manner. As the Department's historical review of its enforcement activities demonstrates, Congress did not intend Section 12601 to serve as an instrument for the Federal Government to bring facial challenges to state or local laws it disfavors. If general enforcement of an allegedly unconstitutional

[2] Nor can such a claim succeed if it is premised on a pattern or practice of enforcing municipal ordinances in general, which is not unlawful.

ordinance were sufficient to trigger Section 12601, Congress's limiting phrase in the statute—"conduct by law enforcement officers"—would do no independent work. ECF No. 33 at 17-21.

Indeed, granting declaratory and injunctive relief here would open the floodgates to the abrogation, through enforcement of federal civil rights legislation, of any number of state, local, and municipal ordinances that might be construed as burdening constitutional rights. If the Court sanctions this use of Section 12601, every change of administration will allow the Executive Branch of the United States Government to pick and choose the local laws, regulations, and ordinances that it does not like and challenge their enforcement using the "pattern or practice" law.

As noted above, the Supreme Court recognizes a constitutional distinction between "what is truly national and what is truly local." *Morrison*, 529 U.S. at 617-18. The Court's recognition that criminal-law and public-safety regulation are traditional state police-power functions supports leaving room for state-authorized local government experimentation rather than constitutionalizing a single national answer to every question involving firearm regulation. *New State Ice Co. v. Liebmann,* 285 U.S. 262, 277-78 (1932) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.") (Brandeis, J., dissent). States and the political subdivisions thereof are better positioned than the Federal Government to fashion regulations to respond to local conditions: policing areas of high population density; regulating mass-transit systems; and protecting areas where crowds gather like schools, concerts, theaters, and other public events are but a few of many areas where state and local governments have superior knowledge, experience, and sensitivity to local or regional

conditions, warranting regulation at the local level. Local governments are also in a better position to assess the risks of gang violence and to gauge local police and other law enforcement resources and constraints.

Just as local governments regulate zoning, noise, fires, explosives, public assemblies, environmental hazards and dangerous instrumentalities, local governments have institutional competence to identify and regulate localized risks. As Justice Brandeis observed, the federal system allows local governments to tailor their ordinances to address local conditions and serve as laboratories for policy experimentation. Within constitutional bounds, local tailoring remains a legitimate and important governmental function. Federalism requires the Court to give respect to state-created local authority and to look to the history and tradition of regulation, including by states, counties, and localities, in assessing the background against which Congress legislated. Courts can honor the Second Amendment while recognizing that the Constitution does not divest state and local governments of all power to regulate public health, safety, order, and welfare.

**3. Colorado's Constitution and statutes affirmatively protect local self-government in public safety matters, including firearm regulation.**

Colorado has made a deliberate constitutional choice to allocate public safety authority to local governments where local conditions require local judgment. Article XX, § 6 of the Colorado Constitution gives the people of qualifying cities and towns the power to adopt charters as their "organic law" for "all [their] local and municipal matters," provides that such charters and ordinances supersede conflicting state law, and declares that home rule municipalities have "the full right of self-government in both local and municipal matters." COLO. CONST., ART XX, § 6. The Colorado Supreme Court has explained that Article XX altered the basic relationship between the state

and home rule municipalities by granting home rule municipalities every power previously possessed by the legislature to authorize municipalities to function in local and municipal affairs. *City & Cnty. of Denver v. State*, 788 P.2d 764, 766-67 (Colo. 1990) (internal citation omitted).

The home rule order provides that, with respect to matters of local concern, home rule ordinances supersede state statutes. By contrast, when a matter is of statewide concern, the General Assembly has plenary authority to legislate. In matters of mixed state and local concern, state and local enactments may coexist absent conflict. *City & Cnty. of Denver*, 788 P.2d at 767. Colorado courts identify the proper category by considering the need for statewide uniformity, the extraterritorial impact of local regulation, whether the matter has traditionally been regulated at the state or local level, and whether the Colorado Constitution specifically commits the matter to one level of government. *City of Com. City v. State*, 40 P.3d 1273, 1279-80 (Colo. 2002). That doctrinal balance is precisely what the Department's theory threatens to sidestep: instead of bringing an ordinary constitutional challenge and satisfying the principles that govern such claims, it asks this Court to treat the enactment and general enforcement of a local ordinance as a federal civil rights "pattern or practice."

The concern is not abstract here. Denver is both a city and county and a home rule municipality, and Colorado law has long treated local firearms regulation as part of the state's allocation of police power authority. *Robertson v. City & Cnty. of Denver*, 874 P.2d 325 (Colo. 1994) illustrates that Colorado courts have historically addressed Denver's assault weapons ordinance under Colorado law. The point for present purposes is not that the Ordinance necessarily prevails on any Second Amendment merits question, but that disagreement with Colorado's allocation of police power

authority is not a "pattern or practice of conduct by law enforcement officers" within the meaning of Section 12601.

The General Assembly has indeed made that allocation explicit for firearms regulation. In 2021, Colorado declared that "the regulation of firearms is a matter of state and local concern," recognizing that local officials are "uniquely equipped" to determine what regulations are necessary in their own jurisdictions. S.B. 21-256, 73rd Gen. Assemb., Reg. Sess. (Colo. 2021). "Unless otherwise expressly prohibited pursuant to state law," a local government may enact an ordinance, regulation, or other law governing or prohibiting the sale, purchase, transfer, or possession of a firearm, ammunition, or firearm component or accessory, so long as the local law is not less restrictive than state law." COLO. REV. STAT. § 29-11.7-103. Thus, Colorado law affirmatively authorizes local governments to make firearm-specific public safety judgments more protective than state law, subject to the limits Colorado itself has chosen.

Counties also occupy an important place in that constitutional and statutory structure. Article XIV, § 16 of the Colorado Constitution vests county electors with the power to adopt a home rule charter establishing the organization and structure of county government, requires home rule counties to provide mandatory county functions, and authorizes them to exercise permissive powers made available by statute. The legislature has authorized home rule county governing bodies to pass ordinances and regulations proper or necessary to carry out their powers. COLO. REV. STAT. § 30-35-201. The legislature has specifically authorized counties to regulate firearm discharge in qualifying unincorporated areas. COLO. REV. STAT. § 30-35-302. Counties therefore appear in this case as local governments whose state-authorized public safety powers would be chilled if this Court allows the Department to recast

enactment and general enforcement of local firearm regulations as systemic police misconduct.

Embracing the Department's theory would upset Colorado's home rule order. If accepted, any Colorado city, town, city and county, or county that enacts or generally enforces a firearm ordinance within the authority granted by Colorado law could face a federal injunction under Section 12601 whenever federal officials characterize the ordinance as unconstitutional on its face. That would invert the statute: a provision aimed at patterns or practices of unconstitutional conduct by law enforcement officers would become a roving mechanism for federal supervision of states' allocation of local police powers. Nothing in Section 12601 requires, or permits, that displacement of Colorado's constitutional order.

## CONCLUSION

Amici respectfully urge the Court to reject the Department's attempt to weaponize Section 12601 against regulations with which it disagrees or those it disfavors as antithetical to American notions of local self-government.

Respectfully submitted,

*/s/ Michael C. Theis*
Michael C. Theis
Edwin E. (Steve) Bruns
Elizabeth A. Och
Hogan Lovells Cadwalader US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
T: 303-899-7300
F: 303-899-7333
michael.theis@hlc.com
steve.bruns@hlc.com
elizabeth.och@hlc.com
*Counsel for Amicus Curiae*

Pursuant to SKC Standing Order for Civil Cases, I, Michael C. Theis, as the preparer of the above filing, certify that any language drafted by AI (even if later edited by a human) was personally reviewed by the filer or another human for accuracy and all legal citations are to actual, non-fictitious cases or cited authority.

*/s/ Michael C. Theis*
Michael C. Theis

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2026 a true and correct copy of the foregoing **BRIEF OF THE BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF JEFFERSON AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** was electronically filed and served via CM/ECF on all counsel of record.

*/s/ Michael C. Theis*