**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

CITY AND COUNTY OF DENVER, COLORADO, and DENVER POLICE DEPARTMENT,

*Defendants.*

Civil Action No. 1:26-cv-1929

# BRIEF OF FORMER CIVIL RIGHTS DIVISION OFFICIALS, BRADY CENTER TO PREVENT GUN VIOLENCE, AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS


*Of Counsel*:

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, D.C. 20002
(202) 370-8160
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

Leigh Rome
William T. Clark
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
244 Madison Ave., Suite 147
New York, N.Y. 10016
(415) 433-2062
lrome@giffords.org
wclark@giffords.org

Joshua Matz
Trisha Anderson*
Nicolas Y. Riley*
Stephen Prifti*
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
(212) 763-0883
jmatz@heckerfink.com
tanderson@heckerfink.com
nriley@heckerfink.com
sprifti@heckerfink.com

*Counsel for Amici Curiae*

**Application for admission pending*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION & INTEREST OF AMICI CURIAE ........ 1

BACKGROUND ........ 3

ARGUMENT ........ 4

I. Section 12601's core function is to remedy the institutional shortcomings within police departments that lead to unlawful patterns and practices. ........ 4

A. Section 12601's history, context, and structure highlight Congress's special focus on institutional failures that produce excessive force and discrimination. ........ 5

B. DOJ's historic enforcement practices likewise reflect the understanding that Section 12601 was meant to target the institutional failures that lead to patterns of brutality and bias ........ 11

II. This lawsuit departs markedly from both Congress's vision for Section 12601 and the Justice Department's longstanding enforcement practices ........ 16

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

## CASES

*Adoptive Couple v. Baby Girl*,
570 U.S. 637 (2013) .......... 10

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) .......... 3

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 18

*Duncan v. Bonta*,
133 F.4th 852 (9th Cir. 2025) .......... 3

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) .......... 3

*United States v. City of Columbus*,
No. 99 Civ. 1097, 2000 WL 1133166 (S.D. Ohio Aug. 3, 2000) .......... 7

*United States v. City of Philadelphia*,
644 F.2d 187 (3d Cir. 1980) .......... 5, 8

## FEDERAL STATUTES

34 U.S.C. § 12601 .......... 1, 3, 5, 6

34 U.S.C. § 12602 .......... 9

42 U.S.C. § 14141 .......... 6

Violent Crime Control and Law Enforcement Act of 1994,
Pub. L. No. 103-322, 108 Stat. 1796 .......... 4, 6, 9, 10

## OTHER AUTHORITIES

139 Cong. Rec. S. 15,042 (Nov. 4, 1993) .......... 7

Barry Friedman, Rachel Harmon, & Farhang Heydari, *The Federal Government's Role in Local Policing*, 109 Va. L. Rev. 1527 (2023) .......... 15

Brady Center to Prevent Gun Violence, *Brady Condemns DOJ Launch of New "Gun Rights" Office That Will Endanger Gun Violence Prevention Laws* (Dec. 4, 2025) ........................17

Brief for the United States, No. 17-60805, 2018 WL 1093719 (5th Cir. Feb. 20, 2018) ........................ 7

Christy E. Lopez, *Proposed Action Memorandum: Preventing and Remedying Patterns or Practices of Law Enforcement Misconduct* (2021) ........................15

DOJ Office of Public Affairs, *Press Release: The U.S. Department of Justice's Civil Rights Division Dismisses Biden-Era Police Investigations and Proposed Police Consent Decrees in Louisville and Minneapolis* (May 21, 2025) ........................18

DOJ, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994–Present* (2017) ........................ 11, 14, 15

Giffords Law Center, *Tracking Trump's Disastrous Record on Guns* (Jan. 23, 2026) ........................17

H.R. Rep. No. 102-242 (1991) ........................ 7, 8, 9, 18

Kenny Lo & Sarah Figgatt, *Violent Crime Rates Declined in 10 Jurisdictions Following Comprehensive Police Reform*, Center for American Progress (Nov. 16, 2020) ........................19

Report of the Independent Commission on the Los Angeles Police Department (July 9, 1991) ........................ 6

Stephen Rushin, Federal Enforcement of Police Reform, 82 Fordham L. Rev. 3189 (2014) ........................15

U.S. Department of Justice, Office of Public Affairs, *Civil Rights 30th Anniversary Celebration of 34 U.S. Code § 12601* (Dec. 3, 2024) ........................19

## INTRODUCTION & INTEREST OF AMICI CURIAE

This lawsuit is a case study in irony. The U.S. Department of Justice seeks to challenge two Denver gun ordinances under a novel and expansive reading of a civil-rights statute that it has spent the past year trying to neutralize in virtually every other context. That civil-rights statute, by its plain terms, prohibits any unconstitutional "pattern or practice of conduct by law enforcement officers." 34 U.S.C. § 12601(a). Yet, the Justice Department has not identified a single instance of any law enforcement officer actually engaging in the conduct that it claims is unconstitutional. And, in yet another ironic twist, when Congress passed the pattern-or-practice statute, the same piece of legislation contained a ban on particularly dangerous weapons similar to those at issue here.

None of this irony is lost on amici, who comprise individuals and organizations with a vested interest in ensuring that the pattern-or-practice statute is enforced as Congress intended. The individual amici are attorneys who served in the agency responsible for enforcing the pattern-or-practice statute: the Justice Department's Civil Rights Division.[1] These amici include former leaders of the Division as well as career supervisors from the Division's Special Litigation Section, which—prior to this Administration—was the office responsible for handling all pattern-or-practice suits and investigations concerning law enforcement agencies. The collective expertise of amici spans from 1994 to 2025, and across multiple administrations, including administrations of both parties. Amici have a strong interest in ensuring that the

[1] The full list of individual amici curiae is attached as an appendix to this brief.

pattern-or-practice statute is interpreted correctly.[2]

In addition to the former Civil Rights Division officials, amici include two of the country's leading gun violence prevention organizations. Brady Center to Prevent Gun Violence is the Nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and advocacy. Giffords Law Center to Prevent Gun Violence is a survivor-led, nonprofit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives. Both organizations share their fellow amici's commitment to civil rights and public safety. They have a substantial interest in ensuring that when democratically elected officials act to reduce our Nation's gun-violence epidemic, those efforts are not thwarted by deeply flawed legal theories pressed by a misdirected Justice Department.

This brief highlights the unprecedented nature of the present lawsuit. The brief traces the history of the pattern-or-practice statute and the Department of Justice's practices in enforcing it. In particular, it explains how Congress originally conceived of the statute primarily as a way to remedy specific forms of police misconduct—such as the use of excessive force against civilians and discriminatory treatment of disfavored groups—that are traceable to *institutional* shortcomings

[2] No counsel for a party to this case authored this brief in whole or in part; no party or counsel for a party contributed monetarily to the preparation or submission of any portion of this brief; and no person other than counsel for amici contributed money that was intended to fund preparing or submitting the brief in this matter. Amici have concurrently filed a motion seeking the Court's leave to file this brief. Defendants consent to amici's filing of this brief. The United States declined to consent to amici's submission of this brief.

within police departments, rather than as a vehicle for bringing facial challenges to state or local laws. The brief outlines how the Civil Rights Division's enforcement practices had historically adhered to that same understanding of the statute, and how the present suit starkly departs from that norm. Finally, the brief underscores how the Justice Department's novel vision of the statute departs not only from Congress's vision for Section 12601, but from the goal of public safety more broadly.

## BACKGROUND

The Department of Justice ("DOJ") seeks to challenge the constitutionality of a pair of longstanding Denver gun ordinances. *See* First Am. Compl. (Doc. No. 31) ¶¶ 4-8, 23; *see also id.* at 13-14. The first is Denver's ban on the possession of assault weapons, including AR-15 style rifles—a weapon known for its "all too frequent use in terrorism, mass killing, and police murder." *Bianchi v. Brown*, 111 F.4th 438, 459 (4th Cir. 2024). The second challenged law is Denver's ban on large capacity magazines capable of holding more than 15 rounds—an accessory that is "frequently used in combination" with assault weapons to devastating effect. *See Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024); *Duncan v. Bonta*, 133 F.4th 852, 860 (9th Cir. 2025) ("A large-capacity magazine is thus an accessory or accoutrement, not an 'Arm' in itself.").

The sole claim in DOJ's amended complaint arises under 34 U.S.C. § 12601. *See* First Am. Compl. ¶¶ 55-57. That statute—which is the focus of this brief—makes it "unlawful for any governmental authority . . . to engage in a pattern or practice of conduct by law enforcement officers" that violates "the Constitution or laws of the United States." 34 U.S.C. § 12601(a). In its amended complaint, DOJ alleges that the

Denver Police Department ("DPD") engages in a pattern or practice of conduct that violates the Second Amendment by enforcing Denver's prohibitions on AR-15 style rifles "with a capacity of more than fifteen (15) rounds" and large capacity magazines. *See* First Am. Compl. ¶¶ 4-8, 17, 23, 32, 39, 42-46. The amended complaint does not identify any specific examples of DPD enforcing these prohibitions.

## ARGUMENT

### I. Section 12601's core function is to remedy the institutional shortcomings within police departments that lead to unlawful patterns and practices.

The Department of Justice's amended complaint is most notable for what it does not say. The amended complaint never mentions, for instance, that Congress—in the very legislation containing the pattern-or-practice statute—once enacted a national ban on firearms similar to those at issue here.[3] Nor does the amended complaint identify a single instance of any arrest or prosecution under Denver's ordinances for possession of an AR-15 style rifle with a large capacity magazine, or possession of a large capacity magazine itself. But the most glaring omission in the amended complaint, to amici's eyes, is not its failure to acknowledge Congress's past endorsement of a similar ban. Rather, it is the amended complaint's failure to identify any obvious connection between the "pattern or practice of conduct" that DOJ seeks to enjoin and some broader institutional failure on the part of DPD itself.

---

[3] *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110102, 108 Stat. 1796, 1996–97 (making it unlawful to "possess a semiautomatic assault weapon" and defining "semiautomatic assault weapon" to include the "Colt AR-15"); *see also* First Am. Compl. ¶ 6 (contending that the "AR-15 style rifle" is the "paradigmatic 'assault weapon' covered by [Denver's] Ordinance").

As explained below, that omission distinguishes this case from the dozens of others that DOJ has sought to pursue under 34 U.S.C. § 12601 since the statute was enacted three decades ago. Congress passed the pattern-or-practice statute to target violations of federal rights that stem from institutional failures within police departments—systemic deficiencies in management, training, oversight, and the like. The statute was never meant to serve as an all-purpose vehicle for the federal government to bring facial challenges to state or local laws that it disfavors. In using the statute for that highly abnormal purpose, DOJ has disregarded both Congress's original understanding of the statute and the agency's own longstanding norms in enforcing it. Amici feel compelled to highlight the dangers of the government's break from those past enforcement norms.

### A. Section 12601's history, context, and structure highlight Congress's special focus on institutional failures that produce excessive force and discrimination.

Throughout the 1950s and 1960s, DOJ repeatedly sought authority from Congress to pursue structural "injunctions against violations of citizens' constitutional rights." *United States v. City of Philadelphia*, 644 F.2d 187, 195 (3d Cir. 1980). But it was not until the early 1990s—when footage of four Los Angeles police officers beating Rodney King shocked the country's conscience—that Congress finally recognized the need for such legislation. Public support for federal action on police reform began to mount after an independent commission concluded that the King beating was not the product of rogue-officer misconduct but, rather, stemmed

from broader systemic failures within the Los Angeles Police Department.[4] When the officers involved in the beating were later acquitted on state criminal charges, the resulting outcry brought the need for federal intervention into even sharper relief.

Congress responded by enacting the Violent Crime Control and Law Enforcement Act of 1994, one of the largest pieces of criminal-justice-reform legislation in history. Pub. L. No. 103-322, 108 Stat. 1796. Among its thirty-three titles, the Act contained the provision that DOJ now invokes as its basis for filing this suit. That provision, known today as Section 12601, reads:

> (a) UNLAWFUL CONDUCT.—It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.
>
> (b) CIVIL ACTION BY ATTORNEY GENERAL.—Whenever the Attorney General has reasonable cause to believe that a violation of paragraph [(a)] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

34 U.S.C. § 12601.[5]

Although Congress did not specify the kinds of "pattern[s] or practice[s]" that could trigger liability under Section 12601, it had certain forms of heartland

---

[4] Report of the Independent Commission on the Los Angeles Police Department (July 9, 1991).

[5] The provision was originally codified as 42 U.S.C. § 14141 but was recodified as 34 U.S.C. § 12601 in 2017. Shortly after the provision's enactment, the Attorney General delegated the pattern-or-practice authority to DOJ's Civil Rights Division. *See* Justice Manual § 82.260.

misconduct in mind. The provision's enactment history reveals a particular focus on two of the principal evils laid bare by the King beating: excessive force and race discrimination. As one of Section 12601's sponsors put it, the primary objective of the provision was to "address[] the nationwide problems of police brutality and misconduct and racial bias in the criminal justice system by giving the Attorney General the power to intervene where a police department has shown a pattern or practice of brutality." 139 Cong. Rec. S. 15,042 (Nov. 4, 1993) (statement of Sen. Moseley-Braun). The House Report on the original version of the pattern-or-practice statute—which was first introduced in 1991—likewise cited the need to curb racial bias and physical abuse by officers as the provision's main impetus. *See* H.R. Rep. No. 102-242, pt. 1, at 135–39 (1991).[6] The report reflected a consensus that these types of misconduct were rooted, fundamentally, in "systemic issues," such as "lax supervision" or "inadequate investigation of [civilian] complaints," and thus required systemic solutions aimed at remedying the institutional shortcomings within police departments. *Id.* at 135–36.

The broader historical context for the legislation underscores Congress's special focus on systemic forms of police misconduct—bias and brutality foremost

[6] Courts, scholars, and DOJ itself routinely rely on the history of this earlier legislation—which contained a provision nearly identical to Section 12601—to understand the context that gave rise to Section 12601. *See, e.g.*, Br. for the United States, *United States v. Lauderdale Cnty.*, No. 17-60805, 2018 WL 1093719, at *22 (5th Cir. Feb. 20, 2018) (consulting this "prior version[]" for guidance in interpreting Section 12601); *United States v. City of Columbus*, No. 99 Civ. 1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000) (reflecting the parties' agreement on the import of this history).

among them. One of the core functions of the pattern-or-practice statute was to fill a hole in DOJ's enforcement authority created by then-recent caselaw. In 1980, the Third Circuit had held that DOJ lacked implied constitutional or statutory authority to sue a local police department "for an injunction against violations of the fourteenth amendment rights of individuals." *City of Philadelphia*, 644 F.2d at 189. That decision put an end to DOJ's years-long effort to enjoin the Philadelphia Police Department's "widespread practice of violating the rights of persons they encounter on the streets" through various forms of "physical abuse" and discriminatory treatment. *Id.* at 190. Congress viewed the pattern-or-practice statute as a way to close the "serious and outdated gap in the federal scheme for protecting constitutional rights" created by the decision. H.R. Rep. No. 102-242, at 137. By expressly authorizing DOJ to pursue the kinds of relief that had been barred by the Philadelphia case, Congress made clear that it viewed the pattern-or-practice statute as a means to secure structural remedies to prevent police brutality and discrimination.

Congress's other stated goals in enacting Section 12601 reflect a similar focus on securing structural remedies to those specific forms of misconduct. Indeed, one of the driving forces behind the statute was Congress's recognition that existing police-accountability tools had failed to root out the kinds of institutional problems within police departments that often led to patterns of physical abuse and discrimination. Prior to the passage of Section 12601, the federal government's primary means of addressing unconstitutional law-enforcement conduct was through criminal

prosecutions of individual officers. But those individual prosecutions—which, at the time, focused overwhelmingly on physical abuse by officers—had proven ineffective at promoting institutional reform. The 1991 House Report outlined how "juries are often reluctant to convict" officers, H.R. Rep. No. 102-242, at 137, and how even when DOJ succeeded in obtaining convictions—as it had in recent cases in North Carolina and Washington—those convictions often failed to yield meaningful change at the department level, *id.* at 138–139. In explaining why DOJ needed the authority to pursue broader injunctive remedies, the report specifically singled out the relationship between department-level shortcomings and incidents of excessive force: "Pattern or practice authority is needed because the Federal Government's criminal authority to prosecute police brutality is not adequate to address patterns or practices such as the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system." *Id.* at 138.

Statutory context and structure reinforce that Congress was especially concerned about the widespread use of excessive force. The Violent Crime Control and Law Enforcement Act of 1994 was a massive piece of legislation, spanning over 300 pages. Section 12601 was one of just two provisions listed in Title XXI, "Subtitle D—Police Pattern or Practice." *See* Pub. L. No. 103-322, 108 Stat. at 2071. The other provision in that subtitle directs the Attorney General to "acquire data about the use of excessive force by law enforcement officers," and to "publish an annual summary of that data." Pub. L. No. 103-322, § 210402, 108 Stat. at 2071 (now codified as 34 U.S.C. § 12602). Congress's conscious choice to pair a provision about excessive-force

data with the pattern-or-practice provision confirms that it viewed excessive force as one of the central systemic harms that it intended Section 12601 to address. *See Adoptive Couple v. Baby Girl*, 570 U.S. 637, 652 (2013) ("[P]rovisions [that] appear adjacent to each other . . . should be read in harmony").

Statutory context also reveals Congress's similar concern with problems of systemic bias in policing and prosecution. The 1994 legislation famously established a National Commission on Crime Control and Prevention and tasked it with, among other things, "examin[ing] the ability of Federal, State, and local criminal justice systems to administer criminal law and criminal sanctions impartially without discrimination on the basis of race, ethnicity, religion, gender, or other legally proscribed grounds." Pub. L. No. 103-322, § 270003(10), 108 Stat. at 2091. The legislation also barred the Attorney General from accepting deportation assistance from any state or local law enforcement agencies that discriminate on the basis of "race, color, or national origin." *Id.* § 130008(a)-(b), 108 Stat. at 2029. And another provision required that juries in capital cases be explicitly instructed not to "consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim." *Id.* § 60002, 108 Stat. at 1966. Section 12601 was thus of a piece with the legislation's overarching goals of purging discrimination from the law enforcement process at the systemic level.

None of this is to say, of course, that Congress intended to limit the "rights, privileges, or immunities" protected under Section 12601 merely to the rights to be free from excessive force or discriminatory treatment by police. The statute's text

contains no such limitation, and the legislative history refers to a wider range of police misconduct, including unlawful searches, arrests, and other on-the-street conduct. But the context, structure, and purpose of Section 12601 all reveal a central focus on police bias and brutality—that is, the kinds of patterns or practices that have long been understood to require structural reform within police departments themselves.

### B. DOJ's historic enforcement practices likewise reflect the understanding that Section 12601 was meant to target the institutional failures that lead to patterns of brutality and bias.

In the three decades since Section 12601 was enacted, DOJ's Civil Rights Division has focused its enforcement efforts on the principal forms of police misconduct that motivated Congress to enact the statute in the first place: misconduct that is traceable to systemic failures within police departments. Indeed, amici are unfamiliar with any Section 12601 suit, prior to this Administration, that asserted a standalone facial challenge to a longstanding state or local law. Instead, the Division has historically "focus[ed] on core issues in police reform common to many law enforcement agencies—such as patterns of unlawful use of force; unlawful stops, searches and arrests; and racial discrimination." DOJ, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994–Present* 6 (2017) ("2017 DOJ Report").

A survey of past Section 12601 cases filed against law enforcement agencies backs that up.[7] These cases—which span four presidential administrations over more

[7] *See* Compl. ¶¶ 22, 26, 29-30, 32, 39-46, *United States v. City of Minneapolis*, No. 25 Civ. 48 (D. Minn. Jan. 6, 2025), Dkt. 1 (excessive force, discriminatory policing, retaliation against protected speech, and disability discrimination); Compl. ¶¶ 20, 29, 34, 37, 45, 61, 67, 79-86, *United States v. Louisville/Jefferson Cnty. Metro Gov't*, No. 24 Civ. 722 (W.D. Ky. Dec. 12, 2024), Dkt. 1 (excessive force, invalid residential search warrant applications, unconstitutional execution of residential search warrants, unconstitutional stops, searches, and arrests, discriminatory policing, retaliation against protected speech, and disability discrimination); Compl. ¶¶ 1, 10, 21-23, *United States v. Springfield, Mass. Police Dep't*, No. 22 Civ. 30043 (D. Mass. Apr. 13, 2022), Dkt. 1 (excessive force); Compl. ¶¶ 23, 31, 41, 44, 54-62, *United States v. Police Dep't of Baltimore City*, No. 17 Civ. 99 (D. Md. Jan. 12, 2017), Dkt. 1 (unlawful stops, searches, and arrests, discriminatory policing, excessive force, retaliation against protected speech, and disability discrimination); Compl. ¶¶ 23-29, *United States v. City of Newark*, No. 16 Civ. 1731 (D.N.J. Mar. 30, 2016), Dkt. 1 (unreasonable stops, searches, and seizures, retaliation against protected speech, unreasonable force, and unlawful stealing of property); Compl. ¶¶ 181-88, *United States v. City of Ferguson*, No. 16 Civ. 180 (E.D. Mo. Feb. 10, 2016), Dkt. 1 (unreasonable stops, searches, detentions, citations, arrests, and force, retaliation against protected speech, improper prosecution and resolution of municipal violations in a manner violating due process and equal protection, and discriminatory policing); Compl. ¶¶ 22-27, 31, *United States v. Cnty. of Los Angeles*, No. 15 Civ. 5903 (C.D. Cal. Aug. 5, 2015), Dkt. 1 (failure to protect, inadequate medical care, and excessive force); Intervention Compl. ¶¶ 62-64, *Melendres v. Arpaio*, No. 07 Civ. 2513 (D. Ariz. July 20, 2015), Dkt. 1177-4 (discriminatory policing); Compl. ¶¶ 19-24, *United States v. City of Cleveland*, No. 15 Civ. 1046 (N.D. Ohio May 26, 2015), Dkt. 1 (unreasonable force, stops, searches, and seizures); Compl. ¶¶ 61-71, *United States v. Cnty. of Los Angeles*, No. 15 Civ. 3174 (C.D. Cal. Apr. 28, 2015), Dkt. 1 (discriminatory policing, unreasonable seizures, and unreasonable force); Compl. ¶¶ 26-28, *United States v. City of Albuquerque*, No. 14 Civ. 1025 (D.N.M. Nov. 12, 2014), Dkt. 1 (excessive force); Compl. ¶¶ 79-88, *United States v. Puerto Rico*, No. 12 Civ. 2039 (D.P.R. Dec. 21, 2012), Dkt. 1 (excessive force, unlawful stops, searches, and seizures, retaliation against protected speech, and discriminatory policing); Compl. ¶¶ 68-77, *United States v. Johnson*, No. 12 Civ. 1349 (M.D.N.C. Dec. 20, 2012), Dkt. 1 (discriminatory policing, unreasonable seizures, and pretextual traffic stops); Compl. ¶¶ 16-17, 19-20, *United States v. City of Portland*, No. 12 Civ. 2265 (D. Or. Dec. 17. 2012), Dkt. 1 (excessive force against persons with actual or perceived mental illness); Compl. ¶¶ 52-62, *United States v. Town of East Haven*, No. 12 Civ. 1652 (D. Conn. Nov. 20, 2012), Dkt. 1 (discriminatory policing, excessive force, and unreasonable searches, arrests, and

detentions); Compl. ¶¶ 49-52, *United States v. City of Seattle*, No. 12 Civ. 1282 (W.D. Wash. July 27, 2012), Dkt. 1 (excessive force); Compl. ¶¶ 29-34, *United States v. City of New Orleans*, No. 12 Civ. 1924 (E.D. La. July 24, 2012), Dkt. 1 (unlawful stops, detentions, searches, arrests, and use of force, and discriminatory policing); Compl. ¶¶ 16, 51-56, *United States v. Town of Colorado City*, No. 12 Civ. 8123 (D. Ariz. June 21, 2012), Dkt. 1 (discriminatory policing); Compl. ¶¶ 165-170, 186-88, *United States v. Maricopa Cnty.*, No. 12 Civ. 981 (D. Ariz. May 10, 2012), Dkt. 1 (discriminatory policing, unreasonable searches, arrests, and detention, and retaliation against protected speech); Compl. ¶¶ 8, 10, *United States v. City of Warren*, No. 12 Civ. 86 (N.D. Ohio Jan. 13, 2012), Dkt. 1 (excessive force); Intervention Compl. ¶¶ 49-54, *Prison Legal News v. Berkeley Cnty Sheriff's Off.* No. 10 Civ. 2594 (D.S.C. Apr. 12, 2011), Dkt. 35-2 (first amendment violations); Intervention Compl. ¶¶ 27-31, *Shreve v. Franklin Cnty.*, No. 10 Civ. 644 (S.D. Ohio Nov. 3, 2010), Dkt. 45-2 (unlawful use of tasers); Compl. ¶¶ 1, 18-19, 24, *United States v. City of New York*, No. 10 Civ. 60 (E.D.N.Y. Jan 7, 2010), Dkt. 1 (inadequate medical care and failure to protect); Compl. ¶¶ 7-8, 10, *United States v. Territory of the Virgin Islands*, No. 08 Civ. 158 (D. VI. Dec. 23, 2008), Dkt. 1 (excessive force); Compl. ¶¶ 7, 9, *United States v. Prince George's Cnty.*, No. 04 Civ. 185 (D. Md. Jan. 22, 2004), Dkt. 1 (excessive force); Compl. ¶¶ 6-11, *United States v. City of Detroit*, No. 03 Civ. 72258 (E.D. Mich. June 12, 2003), Dkt. 1 (excessive force, improper arrests and seizures, failure to secure timely judicial review of warrantless arrests, inadequate medical care, and failure to protect); Compl., *United States v. City of Los Angeles*, No. 00 Civ. 11769 (C.D. Cal. Nov. 3, 2000), Dkt. 1 (excessive force and unlawful seizures, searches, and arrests, as reflected in Consent Decree, Dkt. 123); Compl. ¶¶ 7-10, *United States v. New Jersey*, No. 99 Civ. 5970 (D.N.J. Dec. 22, 1999), Dkt. 1 (discriminatory policing); Compl. ¶¶ 6-10, *United States v. City of Columbus*, No. 99 Civ. 1097 (S.D. Ohio. Oct. 21, 1999), Dkt. 1 (excessive force, false arrests, charges, and paperwork, and unlawful searches); Compl. ¶¶ 8-10, 20, *United States v. City of Steubenville*, No. 97 Civ. 966 (S.D. Ohio Aug. 28, 1997), Dkt. 1 (excessive force, false arrests, charges, and paperwork, tampering with police equipment, improper searches and seizures); Compl. ¶¶ 7-12, *United States v. City of Pittsburgh*, No. 97 Civ. 354 (W.D. Pa. Feb. 26, 1997), Dkt. 1 (excessive force, false arrests, and improper searches and seizures).

The suits that DOJ filed during that period under Section 12601's other clause—concerning patterns or practices of misconduct "by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles"—reflect the same focus on agency-level failures. *See* Compl. ¶¶ 53-56, *United States v. Fulton Cnty.*, No. 25 Civ. 24 (N.D. Ga. Jan. 3, 2025), Dkt. 1 (deprivation of rights, privileges, or immunities secured by the Individuals with Disabilities Education Act); Compl. ¶¶ 12-15, 21-23, *United States v. South Carolina Dep't of Juvenile Justice*, No. 22 Civ. 1221 (D.S.C. Apr. 14, 2022), Dkt. 1 (failure to protect, prolonged isolation for punitive purposes, and excessive force); Compl. ¶¶ 18-27, *United States v. Leflore Cnty.*, No. 15 Civ. 59 (N.D. Miss. May 12,

than two decades—reflect the Division's efforts to prioritize matters that implicate recurring or widespread threats to federal rights posed by systemic law enforcement failures. As the Division explained in a 2017 report on the history of its Section 12601 work, it historically has strived to devote its resources to cases that either raise "issue[s] common to many law enforcement agencies" or implicate "emerging or developing issue[s], such that reforms could have an impact beyond the primary objective of eliminating constitutional violations in the specific law enforcement agency." *Id.*

The Civil Rights Division's careful approach to case selection comports with Section 12601's focus on promoting institutional reform within police departments.

---

2015), Dkt. 1 (inadequate suicide prevention practices, unreasonable risks to safety and welfare, and failure to investigate abuse); Compl. ¶¶ 163-91, *United States v. Meridian*, Nos. 12 Civ. 168, 13 Civ. 978 (S.D. Miss. Oct. 24, 2012), Dkt. 1 (unlawful arrests and denial of due process); Compl. ¶¶ 12, 21-22, *United States v. Terrebonne Parish*, No. 11 Civ. 2484 (E.D. La. Oct. 4, 2011), Dkt. 1 (failure to protect); Compl. ¶¶ 11-14, *United States v. New York*, No. 10 Civ. 858 (N.D.N.Y. July 14, 2010) (failure to protect and inadequate medical care); Compl. ¶¶ 22-30, *United States v. Strickland*, No. 08 Civ. 475 (S.D. Ohio May 16, 2008), Dkt. 2 (failure to protect, inadequate medical care, and deprivation of rights, privileges, or immunities secured by the Individuals with Disabilities Education Act); Compl. ¶¶ 14-19, *United States v. Texas*, No. 08 Civ. 38 (S.D. Tex. Feb. 1, 2008), Dkt. 1 (failure to protect, failure to afford adequate due process, and inadequate rehabilitative treatment); Compl. ¶¶ 13-17, 21, *United States v. Arizona*, No. 04 Civ. 1926 (D. Ariz. Sept. 15, 2004), Dkt. 1 (failure to protect, unreasonable isolation, and inadequate medical care, and deprivation of rights, privileges, or immunities secured by the Individuals with Disabilities Education Act); Compl. ¶¶ 17-18, 22, *United States v. Oklahoma*, No. 06 Civ. 673 (N.D. Okla. Dec. 15, 2006), Dkt. 2 (failure to protect and inadequate medical care); Compl. ¶¶ 17-25, *United States v. Mississippi*, No. 03 Civ. 1354 (S.D. Miss. Dec. 18, 2003), Dkt. 1 (failure to protect, unreasonable isolation and restraints, failure to provide adequate due process, inadequate medical care and rehabilitative treatment, and deprivation of rights, privileges, or immunities secured by the Individuals with Disabilities Education Act).

Pattern-or-practice cases are notoriously "resource intensive: investigating, negotiating, and enforcing reform against just one police department can take several years and several lawyers from DOJ." Barry Friedman, Rachel Harmon, & Farhang Heydari, *The Federal Government's Role in Local Policing*, 109 Va. L. Rev. 1527, 1619 (2023). The specific office responsible for investigating and bringing pattern-or-practice cases against law enforcement agencies—the Special Litigation Section—has to contend with budget and staffing constraints that can pose challenges for long-term investigation and reform efforts. *See* Christy E. Lopez, *Proposed Action Memorandum: Preventing and Remedying Patterns or Practices of Law Enforcement Misconduct* 5 (2021). As an attorney from that unit explained during a 2013 interview, "there's no way that the Justice Department can litigate all of the patterns and practices of police misconduct in this country. There are too many policing jurisdictions for them to do that." Stephen Rushin, *Federal Enforcement of Police Reform*, 82 Fordham L. Rev. 3189, 3242 n.355 (2014) (quoting a former DOJ litigator).

Faced with that reality, the Division has traditionally prioritized cases and investigations where it can leverage its unique expertise to advance meaningful reforms at an institutional level. Those reform efforts often entailed working cooperatively with police departments to develop strategies for strengthening community relations, modify their use-of-force policies and training programs, adopt new systems of officer accountability, and improve officer well-being, among other things. *See* 2017 DOJ Report 25–34. Abandoning that historic focus on achieving structural reforms within police departments would effectively convert Section 12601

from a remedy for institutional problems into a roving mandate for DOJ to challenge whatever state or local laws its political leadership disfavors. That is plainly not the function Congress envisioned for the statute.

## II. This lawsuit departs markedly from both Congress's vision for Section 12601 and the Justice Department's longstanding enforcement practices.

This case represents a novel—and dangerous—use of Section 12601. As noted, the Justice Department is challenging Denver's prohibitions on AR-15 style rifles with a large capacity magazine, and large capacity magazines. But DOJ does not identify a single example of DPD actually enforcing these prohibitions against anyone, much less any "pattern or practice" that might be traceable to some broader institutional failure within DPD.[8] On its face, then, the amended complaint does not purport to challenge any systemic failure on DPD's part with respect to management, oversight, training, or any of its other independent institutional choices. Such a suit perverts Congress's basic goals in enacting Section 12601. *See supra* Part I.A.

---

[8] The only allegation that DOJ makes in its amended complaint of a pattern or practice of enforcement is the unadorned allegation that DPD has "routinely enforced" the two prohibitions "for many years and will continue to do so in the future unless enjoined." First Am. Compl. ¶ 46. The amended complaint does not cite any examples of any arrests or prosecutions under the ordinances, let alone any arrests or prosecutions for the specific conduct DOJ claims is protected here: namely, the possession of an AR-15 style rifle with a large capacity magazine, or a large capacity magazine (as opposed to the various other weapons covered by the ordinances). *See* First Am. Compl. at 14 (praying for an order "enjoining Defendants and their agents from enforcing the [Ordinances] to the extent it bans the possession of AR-15 style rifles with standard capacity magazines"). Amici's own search (on Bloomberg and Westlaw) for criminal prosecutions under the challenged Denver ordinances for possession of an AR-15 style rifle with a large capacity magazine, or a large capacity magazine, came up empty.

Indeed, DOJ's Section 12601 claim does not require any more insight into DPD's institutional operations than would a suit by a private citizen. *E.g.*, Compl. ¶ 69, *Elliot v. City and Cnty. of Denver*, No. 26 Civ. 2948 (D. Colo. June 30, 2026), Dkt. 1 (challenging Denver's prohibitions on the AR-15 and large capacity magazines under Denv., Colo., Rev. Mun. Code ch. 38, art. IV, §§ 38-121(c), 38-121(g)). The government's use of its limited resources to pursue a facial challenge that conceivably could have been brought by a private citizen only further distinguishes this case from the kinds DOJ has historically brought and that Congress viewed as within the heartland of the statute. As noted, prior to this Administration, the Civil Rights Division had focused its attention on the kinds of cases where it could deploy its unique expertise in department-level investigations and reform to safeguard people's rights. Suits that challenge the constitutionality of state or local laws on their face require no such expertise.[9]

Moreover, dedicating government resources to such suits runs counter to one of the purposes of Section 12601: to provide a remedy for police misconduct that existing litigation tools could not. Congress expressly envisioned the pattern-or-

[9] The present suit appears to reinforce this fact: it was brought by the "Second Amendment Section," a newly created office within the Civil Rights Division, rather than the unit that has overseen the Division's pattern-or-practice work for the past thirty years. The Justice Department's Second Amendment Section is one example of the Trump Administration's strategy of diverting resources away from the longstanding Justice Department programs that protect public safety to instead prioritize gun industry profits. *See* Brady Center to Prevent Gun Violence, *Brady Condemns DOJ Launch of New "Gun Rights" Office That Will Endanger Gun Violence Prevention Laws* (Dec. 4, 2025); Giffords Law Center, *Tracking Trump's Disastrous Record on Guns* (Jan. 23, 2026).

practice statute as a vehicle that would enable DOJ to obtain the kind of relief that was typically unavailable to private litigants. The 1991 House Report, for instance, specifically cited the challenges that private litigants faced in securing systemic equitable relief under the Supreme Court's then-recent decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), as one of the justifications for authorizing pattern-or-practice suits. H.R. Rep. No. 102-242, at 137.

DOJ's decision to devote its resources to this suit is all the more alarming in light of the Civil Rights Division's efforts to jettison the rest of its Section 12601 cases over the past year. The current Division has proudly announced that it is ending pattern-or-practice investigations and suits focused on core forms of law-enforcement misconduct, such as discriminatory policing and unjustified uses of force, including deadly force. *E.g.*, DOJ Office of Public Affairs, *Press Release: The U.S. Department of Justice's Civil Rights Division Dismisses Biden-Era Police Investigations and Proposed Police Consent Decrees in Louisville and Minneapolis* (May 21, 2025), https://www.justice.gov/opa/pr/us-department-justices-civil-rights-division-dismisses-biden-era-police-investigations-and. Those efforts reflect a fundamental disregard for the types of civil rights violations that motivated Congress to pass Section 12601 in the first place.

That disregard comes at a steep cost. In addition to protecting people's rights, the institutional changes achieved through Section 12601 serve to promote public safety by restoring trust in law enforcement—particularly in places where that trust has been broken by longstanding patterns or practices of misconduct. As one former

police commissioner recently observed in reflecting on his own experience with Section 12601, "reform and public safety work hand in hand." U.S. Department of Justice, Office of Public Affairs, *Civil Rights 30th Anniversary Celebration of 34 U.S. Code § 12601*, at 1:26:49 (Dec. 3, 2024), https://www.justice.gov/archives/opa/video/civil-rights-30th-anniversary-celebration-34-us-code-ss-12601 (remarks of Michael Harrison, former commissioner of the Baltimore Police Department and former superintendent of the New Orleans Police Department).[10] Giving up on the work of institutional police reform, and replacing it with transparently political lawsuits targeting laws that the Administration disfavors, thus threatens to undermine not only the goals of Section 12601, but public safety more broadly.

## CONCLUSION

Amici respectfully urge the Court to give full consideration to the foregoing considerations in resolving this dispute.

[10] *See also, e.g.*, Kenny Lo & Sarah Figgatt, *Violent Crime Rates Declined in 10 Jurisdictions Following Comprehensive Police Reform*, Center for American Progress (Nov. 16, 2020), https://www.americanprogress.org/article/violent-crime-rates-declined-10-jurisdictions-following-comprehensive-police-reform/ (discussing drop in violent-crime rates in ten jurisdictions following Section 12601 consent decrees).

Dated: August 17, 2026

Respectfully Submitted,

*/s/ Joshua Matz*
Joshua Matz
Trisha Anderson*
Nicolas Y. Riley*
Stephen Prifti*
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
(212) 763-0883
jmatz@heckerfink.com
tanderson@heckerfink.com
nriley@heckerfink.com
sprifti@heckerfink.com

*Counsel for Amici Curiae*

**Application for admission pending*

*Of Counsel*:

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, D.C. 20002
(202) 370-8160
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

Leigh Rome
William T. Clark
GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE
244 Madison Ave., Suite 147
New York, N.Y. 10016
(415) 433-2062
lrome@giffords.org
wclark@giffords.org

## CERTIFICATE AS TO ARTIFICIAL INTELLIGENCE

I certify that no portion of this filing was drafted by artificial intelligence.

*/s/ Joshua Matz*
Joshua Matz

## CERTIFICATE OF SERVICE

I certify that on August 17, 2026, I electronically filed the foregoing Brief of Former Civil Rights Division Officials, Brady Center to Prevent Gun Violence, and Giffords Law Center to Prevent Gun Violence as Amici Curiae in Support of Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

*/s/ Joshua Matz*
Joshua Matz